# In the United States Court of Federal Claims

## No. 04-1733C
### (Filed: December 20, 2010)

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                             *
120 DELAWARE AVENUE, LLC,                     *
                                             *
            Plaintiff,                        *
                                             *
                                             *
                  v.                          *
                                             *
                                             *
THE UNITED STATES,                            *
                                             *
            Defendant.                        *
                                             *
                                             *
* * * * * * * * * * * * * * * * * * * * * * * *
```

Motion to Dismiss; Subject Matter
Jurisdiction; Failure to State a Claim;
RCFC 12(b)(1); RCFC 12(b)(6); Fifth
Amendment Taking; Inverse
Condemnation; Physical Taking;
Regulatory Taking; Temporary Taking;
Partial Taking; Distinction between
Taking and Tort; Sufficiency of
Pleadings; Just Compensation; Fair
Rental Value.

Daniel C. Oliverio, Hodgson Russ LLP, The Guaranty Building, 140 Pearl Street, Suite 100, Buffalo, NY 14202, for Plaintiff.

Timothy P. McIlmail, United States Department of Justice, Commercial Litigation Branch, Civil Division, 1100 L Street, N.W., 8th Floor, Washington, D.C. 20530, for Defendant.

_____

## OPINION AND ORDER
## DENYING DEFENDANT'S MOTION TO DISMISS

_____

**WILLIAMS**, Judge.

Plaintiff, 120 Delaware Avenue, LLC ("120 Delaware"), brings this action against the United States, seeking compensation for a Fifth Amendment taking by inverse condemnation. Plaintiff claims that the United States Army Corps of Engineers ("Corps") served its tenants with an official 90-Day Notice to Vacate its building but ultimately did not condemn the property until months later. According to Plaintiff, the Government's issuance of the 90-Day Notice and eventual relocation of Plaintiff's tenants resulted in lost rental income in an amount not less than $750,000.

This matter comes before the Court on Defendant's motion to dismiss for lack of jurisdiction or for failure to state a claim upon which relief can be granted.  Because Plaintiff has alleged facts that give rise to a plausible claim of inverse condemnation -- a takings claim within this Court's jurisdiction -- Defendant's motion to dismiss is denied.

## Background[1]

Plaintiff is a New York limited liability company with its principal place of business in Buffalo, New York.  Plaintiff owned a multi-tenant, Class A office building with a historic occupancy rate of 90 to 95 percent located at 120 Delaware Avenue in Buffalo, New York.  At all times relevant to this action, Plaintiff had separate lease agreements with at least 16 tenants.

By letter dated February 3, 2003, the United States General Services Administration ("GSA") notified 120 Delaware of its intention to construct a new federal courthouse "on Niagara Square on the block bounded by West Mohawk St., Delaware Ave and Niagara Street." Third Am. Compl. Ex. A.  GSA further stated that it would commence the site acquisition process in March.

By letter dated July 10, 2003, GSA notified 120 Delaware that construction of the new courthouse required acquisition of the property located at 110-120 Delaware Avenue.  GSA further stated that it had completed its preliminary acquisition survey and a fair market value appraisal of the property.  It offered to purchase the property for $2.5 million and provided a contract to sell real property.  On September 26, 2003, the Corps served 120 Delaware's tenants with the 90-Day Notice, which required them to vacate the property no later than May 1, 2004.

By letter dated February 13, 2004, the Corps advised 120 Delaware and its tenants that the date to vacate the property had been extended to February 1, 2005, due to a delay in obtaining funding for the construction of the courthouse.  The letter also stated, "your current lease is in full force and effect until the Government acquires the buildings."  Third Am. Compl. Ex. D.  The Corps began relocating tenants in February of 2004 and completed relocation of most of the tenants by the end of August of 2004.  However, by letter dated July 27, 2004, GSA notified 120 Delaware's attorneys that it was "not proceeding to acquire title to [120 Delaware] by condemnation at the present time."  Third Am. Compl. ¶ 16, Ex. E.

Between February and December of 2004, the Government relocated approximately three-fourths of 120 Delaware's tenants, representing approximately one-half of its monthly rental income.  Three additional tenants were relocated in February and March of 2005, leaving Lawley Services, Inc., as the sole tenant.[2]  120 Delaware did not receive rental payments from its tenants after their relocation.

---

[1] This background is derived from the third amended complaint and its exhibits, the Court's March 23, 2005 Order, and the motion papers.

[2] Lawley Services, Inc., "had overlapping ownership with 120 Delaware."  Third Am. Compl. ¶ 7.

On December 3, 2004, 120 Delaware commenced an action for inverse condemnation against the Government in this Court.  On February 24, 2005, the Government filed a Declaration of Taking with respect to the property, and all proceedings in the inverse condemnation action were stayed. Id. ¶ 19; Order Granting Stay of Proceedings Mar. 23, 2005. The Government's February 2005 eminent domain lawsuit related to this property was resolved in 2008 by a stipulation that expressly reserved 120 Delaware's right to proceed with this action.

In the instant action, 120 Delaware seeks just compensation for the Government's deprivation of its rental income in an amount not less than $750,000.  On June 2, 2010, the Court granted the Government's motion to dismiss Plaintiff's second amended complaint for lack of jurisdiction, in part, and dismissed all of Plaintiff's tort claims.  The Court authorized Plaintiff to file a third amended complaint alleging any remaining claims not sounding in tort, and 120 Delaware filed its third amended complaint on July 20, 2010, alleging only a Fifth Amendment taking by inverse condemnation.

## **Discussion**

### **Subject Matter Jurisdiction**

Defendant moves this Court to dismiss Plaintiff's third amended complaint for lack of subject matter jurisdiction on the ground that Plaintiff's claim, although denominated a taking, actually sounds in tort and is outside the purview of this Court.  See 28 U.S.C. § 1491(a)(1).

The United States Court of Federal Claims is a court of limited jurisdiction.  28 U.S.C. § 1491(a)(1); Brown v. United States, 105 F.3d 621, 623 (Fed. Cir. 1997).  The Tucker Act confers jurisdiction on this Court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).

Plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence before the Court may proceed to the merits of the action.  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988); BearingPoint, Inc. v. United States, 77 Fed. Cl. 189, 193 (2007).  When determining jurisdiction, the Court must accept as true all undisputed allegations of fact made by the non-movant and draw all reasonable inferences from those facts in the non-movant's favor.  Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).  If subject matter jurisdiction cannot be established, the Court must dismiss the complaint. RCFC 12(h)(3); Naskar v. United States, 82 Fed. Cl. 319, 320 (2008).

The Takings Clause of the Fifth Amendment permits the Government to appropriate private property or restrict its use for the public benefit so long as the property owner receives just compensation.  The Government may be found liable for a taking where it physically occupies, appropriates, or invades private property for itself or a third party (i.e., a physical taking) or limits the use of private property (i.e., a regulatory taking).  See Daniel L. Seigel & Robert Meltz, Temporary Takings:  Settled Principles and Unresolved Questions, 11 Vt. J. Envtl. L. 479, 480 (2010); Forest Props., Inc. v. United States, 177 F.3d 1360, 1364 (Fed. Cir. 1999)

("A physical taking of land occurs when the [G]overnment itself occupies the property or 'requires the landowner to submit to physical occupation of its land,' whether by the [G]overnment or a third party. . . . In a regulatory taking the [G]overnment prevents the landowner from making a particular use of the property that otherwise would be permissible.") (internal citations omitted) (emphasis in original).

A taking may be temporary or permanent as well as total or partial. It is well settled that the Government must pay just compensation for a temporary taking. First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles, 482 U.S. 304, 321 (1987) (citations omitted) (holding "that where the [G]overnment's activities have already worked a taking of all use of property, no subsequent action by the [G]overnment can relieve it of the duty to provide compensation for the period during which the taking was effective."). To prove entitlement to just compensation, Plaintiff must also show a substantial financial loss or burden. Ferrari v. United States, 73 Fed. Cl. 219, 226 (2006). When a taking occurs, the property owner is entitled to just compensation because the taking imposes a burden on the individual that, in fairness and justice, society, as a whole, should bear. Armstrong v. United States, 364 U.S. 40, 49 (1960).

Plaintiff has characterized its claim as a taking by inverse condemnation, which is "a cause of action against the [G]overnment to recover the value of property taken by the [G]overnment without [the] formal exercise of the power of eminent domain." Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir. 2005); see also United States v. Clarke, 445 U.S. 253, 257 (1980) (describing inverse condemnation as "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted."); Althaus v. United States, 7 Cl. Ct. 688, 694, 696-97 (1985) (finding a taking where the Government's threat to acquire property by eminent domain "paralyzed the plaintiffs' use of and ability to sell their properties except to the [G]overnment" and prevented the plaintiffs from developing the properties). To the extent Plaintiff alleges a nonfrivolous claim of inverse condemnation founded upon the Fifth Amendment, "jurisdiction under the Tucker Act is proper." Nance v. United States, 92 Fed. Cl. 41, 46 (2010).

Although Plaintiff alleged a taking by inverse condemnation, Defendant asserts that Plaintiff's claim is actually a tort over which this Court lacks jurisdiction. Regardless of how Plaintiff characterizes its claim, the Court must "look to the true nature of the action" to determine whether jurisdiction exists. Nat'l Ctr. for Mfg. Scis. v. United States, 114 F.3d 196, 199 (Fed. Cir. 1997) (quoting Katz v. Cisneros, 16 F.3d 1204, 1207 (Fed. Cir. 1994)). In Ridge Line, Inc. v. United States, the Federal Circuit articulated a two-part test for determining whether a governmental action resulted in a taking or a tort:

> First, a property loss compensable as a taking only results when the [G]overnment intends to invade the protected property interest or the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.' Second, the nature and magnitude of the government action must be considered. Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the [G]overnment at the expense of the property owner, or

4

at least preempt the owner's right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value.

346 F.3d 1346, 1355-56 (Fed. Cir. 2003) (internal citations omitted); see also Hansen v. United States, 65 Fed. Cl. 76, 80-81 (2005).

Plaintiff has claimed that the Government issued a notice to vacate to the tenants of 120 Delaware, and in reliance on that notice, many tenants relocated, terminating and/or not renewing their leases, depriving Plaintiff of its property interest for a public use. Plaintiff has identified governmental actions -- issuance of the 90-Day Notice and the ensuing relocation of tenants -- that restricted Plaintiff's use of its property and has represented that it sustained a substantial financial burden or loss -- the deprivation of rental income in an amount not less than $750,000 -- as a direct result of the Government's activity. Although these allegations might also give rise to a claim for tortious interference with contractual relations -- in particular with Plaintiff's leases with its tenants -- that does not preclude these same allegations from establishing the jurisdictional predicates for a takings claim. As the Federal Circuit explained in Del-Rio Drilling Programs, Inc. v. United States:

> If the [G]overnment appropriates property without paying just compensation, a plaintiff may sue in the Court of Federal Claims on a takings claim regardless of whether the [G]overnment's conduct leading to the taking was wrongful, and regardless of whether the plaintiff could have challenged the [G]overnment's conduct as wrongful in another forum.

146 F.3d 1358, 1363 (Fed. Cir. 1998). As such, the fact that the complaint suggests that the Government may have also acted tortiously toward Plaintiff in interfering with its leases does not remove Plaintiff's claim from this Court's jurisdiction.

## Failure to State a Claim

In the alternative, Defendant moves the Court to dismiss the complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Pursuant to Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); Gay v. United States, 93 Fed. Cl. 681, 685 n.3 (2010); see generally Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (construing Rule 8 of the Federal Rules of Civil Procedure, which is identical to RCFC 8). Although Rule 8 does not require detailed factual allegations, it does demand more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 129 S. Ct. at 1949 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

To survive a motion to dismiss under Rule 12(b)(6), the complaint must contain facts sufficient to "'state a claim to relief that is plausible on its face.'" Id. at 1949 (quoting Twombly, 550 U.S. at 570). To determine whether a complaint states a plausible claim for relief, a court must engage in a context-specific analysis and "draw on its judicial experience and common sense." Id. at 1950. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.

5

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949 (citing Twombly, 550 U.S. at 556). However, the plausibility standard requires more than a "sheer possibility" that the defendant has violated the law. Id. (citing Twombly, 550 U.S. at 557). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). The complaint must plausibly suggest that the plaintiff has a right to relief "above a speculative level' and cross "the line from conceivable to plausible." Twombly, 550 U.S. at 555, 570.

As noted above, in the context of distinguishing a taking from a tort, the Federal Circuit, recognizing that "'inverse condemnation law is tied to, and parallels, tort law,'" articulated a two-part test to show a taking by inverse condemnation. Ridge Line, 346 F.3d at 1355 (citation omitted). To make such a showing, Plaintiff must demonstrate that: (i) the Government intentionally invaded a protected property interest, or the invasion was the "'direct, natural, or probable result of an authorized activity,'" not an incidental or consequential injury; and (ii) the invasion appropriated a benefit to the Government at the property owner's expense, or at least preempted his right to enjoy his property for an extended period of time, rather than merely inflicting an injury that reduced the property's value. Id. at 1355-56.

Defendant contends that 120 Delaware does not possess a property interest in lost rent from tenants who terminated or failed to renew their leases, because, until paid, this money belongs to the tenants. Courts look to state law "to define the range of interests that qualify for protection as 'property' under the Fifth and Fourteenth Amendments." Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1030 (1992) (citations omitted); McKay v. United States, 199 F.3d 1376, 1381 (Fed. Cir. 1999) ("The trial court was correct to look to Colorado law to determine if there was a property right that could be violated, since the Fifth Amendment protects rather than creates property interests."). Here, the Court must examine New York law to determine if Plaintiff has a property interest in lost rental income. While this Court does not resolve this issue in the context of deciding a motion to dismiss, preliminary research indicates that New York bankruptcy courts have recognized that "rents are considered real property." 641 Ave. of Americas Ltd. P'ship v. 641 Assocs., Ltd., 189 B.R. 583, 590 (Bankr. S.D.N.Y. 1995); see also In re Fin. Ctr. Assocs. v. TNE Funding Corp., 140 B.R. 829, 831 (Bankr. E.D.N.Y. 1992) ("under New York law, rents are considered interests in real property"); Cmty. Bank, Nat'l Ass'n v. Lyons (In re Lyons), 177 B.R. 767, 771 (Bankr. N.D.N.Y. 1994), aff'd, 177 B.R. 772 (N.D.N.Y. 1995).

With regard to the second prong of the test -- whether the Government preempted 120 Delaware's right to use its property for an extended period of time -- Plaintiff alleges that during the period of the taking, the Government deprived it of approximately three-fourths of its tenants and about half of its monthly rental income. The issue presented here, which appears to be one of first impression, is whether it is plausible that this type of governmental action could constitute a compensable taking.

Analyzing Plaintiff's allegations under the Ridge Line factors, the Court concludes that it is plausible that Plaintiff may be able to prove a taking by inverse condemnation by showing: (i) that the Government intentionally invaded Plaintiff's interest in its leases by ordering the tenants to vacate the property for an extended time before it condemned the property; and (ii) that this

invasion preempted Plaintiff's right to use its property by depriving it of rental income.  Whether the duration of this taking is a sufficiently "extended" period is open to question, but this legal issue does not warrant immediate dismissal.  Nor is it apparent whether this type of invasion is a sufficient preemption to constitute a compensable taking -- that is a close question which ought not be resolved at the pleading stage.

While Twombly and Iqbal have imposed heightened pleading requirements in the factual realm, these cases do not require dismissal where a plaintiff's entitlement to relief is not settled as a matter of law.  In denying Defendant's motion to dismiss, this Court makes no finding whether there was a taking or if so, how any such taking should be characterized.  The novelty of these issues and the divergence of possible analytical approaches are further reasons for allowing Plaintiff to pursue this action beyond the pleading stage.

Defendant also argues that Plaintiff's claim should be dismissed for failure to state a claim because fair market value, not unpaid rent, is the proper measure of just compensation.  However, the Constitution does not define the term "just compensation," and courts have calculated just compensation in various ways, including but not limited to, fair rental value.

In Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1578, 1580-81, 1583 (Fed. Cir. 1990), the Federal Circuit affirmed an award of just compensation resulting from the Government's temporary taking of mineral rights even though the award was based on the rent and minimum royalties that would have been paid during the taking period under a proposed joint venture agreement.  The Federal Circuit observed:

> Normally, the proper measure of just compensation for the [G]overnment's permanent taking of private property is 'the fair market value of [the] property at the time of the taking.' . . .  In the case of a temporary taking, however, since the property is returned to the owner when the taking ends, the just compensation to which the owner is entitled is the value of the use of the property during the temporary taking, i.e., the amount which the owner lost as a result of the taking . . . The usual measure of just compensation for a temporary taking, therefore, is the fair rental value of the property for the period of the taking.

Id. at 1580-81 (internal citations omitted); see also United States v. Pewee Coal Co., Inc., 341 U.S. 114, 115, 118-19 (1951) (affirming a judgment by the Court of Claims ordering the Government to pay certain operating losses mainly attributable to increased wage payments incurred when it temporarily seized and operated a coal mine to avert a strike); W.H. Pugh Coal Co. v. State of Wisconsin, 157 Wis. 2d 620, 625, 631 (Wis. Ct. App. 1990) (finding the proper measure of damages for a temporary taking to be the reasonable value of the property's use and allowing evidence of lost income to be considered when determining just compensation).

Further, as commentators have recognized, rental value, which has been defined as "'the price that a willing lessee would pay to a willing lessor for the period of the taking,'" is probably the most common measure of compensation for temporary regulatory takings.  Seigel & Meltz, supra, at 513; see also J. Margaret Tretbar, Calculating Compensation for Temporary Regulatory Takings, 42 Kan. L. Rev. 201, 205 (1993) ("Generally, compensation for temporary physical

takings has been determined by estimating the fair rental value of the property interest taken for the duration of the taking."); 4 Julius L. Sackman, Nichols on Eminent Domain § 12E.01[1] (3d ed. 2009).  These commentators further observed that where a temporary government occupation suspends an ongoing business on a property, rental value should also reflect "loss in going-concern value (i.e., lost profit and good will)."  Seigel & Meltz, supra, at 513.  In light of Yuba and these additional authorities, it is plausible that just compensation for the alleged taking could be measured by the fair rental value of the property for the time Plaintiff lost the ability to collect its expected rents.

Defendant relies on Kirby Forest Industries, Inc. v. United States, 467 U.S. 1, 10 (1984), to support its assertion that the property's fair market value -- not unpaid rental income -- must be the proper measure of just compensation unless fair market value is too difficult to determine.  However, Kirby should not be read to exclude other measures of just compensation.  As the Kirby Court itself observed, fair market value may not be the sole measure of just compensation if it "is too difficult to find" or would result in "'manifest injustice to [the] owner or public.'"  Id. at 10 n.14 (citation omitted).  The Kirby Court further noted that, in some cases, fair market value "fails to fully to indemnify the owner for his loss" and made clear that its decision was not intended to modify "the test for determining when the fair-market-value standard must be supplanted by other formulae."  Id. at 10 n.15.

In sum, Plaintiff has stated a novel takings claim that survives Defendant's motion to dismiss.  However, as Chief Judge Hewitt recognized in Banks v. United States, "[t]he court's conclusion that plaintiffs have alleged a taking does not, however, prove that a taking has occurred.  The burden remains with the plaintiffs to present evidence to prove their case at trial." 69 Fed. Cl. 206, 214 (2006).

### Conclusion

Defendant's motion to dismiss is **DENIED**.  The Court will conduct a telephonic conference to schedule further proceedings on **January 6, 2011**, at **3:00 p.m. EST.**

s/ Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

8